## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re: Effexor XR Antitrust Litigation<br><br>This document relates to:<br><br>All Actions | Lead case: 3:11-cv-05479-PGS-LHG (D.N.J.) |

## PLAINTIFFS' MOTION TO TRANSFER,
## OR IN THE ALTERNATIVE, TO COMPEL

## **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................... 1

    **A.**    Categories of Information at Issue ........................................................ 3

    **B.**    Transfer to the Issuing Court in the District of New Jersey is Warranted ............. 5

II.   FACTUAL BACKGROUND ........................................................................ 5

    **A.**    The Challenged Conduct ....................................................................... 5

    **B.**    Plaintiffs Subpoena Apotex ................................................................. 7

III.  THIS COURT SHOULD TRANSFER THIS MATTER TO THE ISSUING COURT IN THE DISTRICT OF NEW JERSEY ................................................. 8

    **A.**    Transfer to the District of New Jersey is Warranted to Ensure Uniformity of Rulings ........................................................................ 8

    **B.**    Transfer to the District of New Jersey is Warranted Because the Court in the *Effexor XR* Action Is in the Best Position to Rule on the Motion to Compel ........ 9

    **C.**    Transfer to the District of New Jersey Would Impose Little if Any Burden on Apotex, and Any Burden Can Be Easily Alleviated ............................................. 11

IV.   ALTERNATIVELY, APOTEX SHOULD BE COMPELLED TO PRODUCE THE DOCUMENTS REQUESTED IN THE APOTEX SUBPOENA ................................... 12

    **A.**    Legal Standard ..................................................................................... 12

    **B.**    Apotex's Sales Data Is Relevant, Not Obtainable from Defendants, and Not Burdensome to Produce ........................................................................ 13

    **C.**    The Apotex Forecasts and Launch Projections Are Relevant, Not Obtainable From Defendants, and Not Burdensome to Produce ............................................. 17

    **D.**    The Apotex Settlement and Authorized Generic Negotiation Documents Are Relevant and Not Burdensome to Produce .......................................................... 19

V.    CONCLUSION ........................................................................................... 20

i

## I.     __INTRODUCTION__

The instant Motion seeks to compel compliance with a non-party subpoena issued to Apotex Corp. ("Apotex") in *In re: Effexor XR Antitrust Litigation,* 11-cv-05479 (D.N.J.) (the "*Effexor XR* Action") pending in the District of New Jersey.  The subpoena to Apotex (the "Apotex Subpoena") has been outstanding for eight months.[1]  Apotex has refused to produce responsive information, namely: (1) its sales data showing its sales of generic and authorized generic ("AG") Effexor XR; (2) its forecasts and launch plans for its generic version of Effexor XR, AG Effexor XR, and related documents; and (3) documents relating to the negotiation and settlement of the patent infringement litigation that Wyeth Pharmaceuticals ("Wyeth") filed against Apotex concerning Apotex's generic version of Effexor XR, including documents relating to the license Wyeth issued Apotex concerning Effexor XR and AG Effexor XR.  These three categories of information are plainly relevant to Plaintiffs' claims in the *Effexor XR* Action.

Preliminarily, Plaintiffs seek to transfer the Apotex discovery dispute to the Honorable Peter G. Sheridan of the District of New Jersey (who has referred all discovery matters to Magistrate Judge Lois H. Goodman), before whom the *Effexor XR* Action is pending.  That court is intimately familiar with the relevant facts and issues in this long-pending matter, and is best positioned to rule on Plaintiffs' motion to compel.  Should Plaintiffs' transfer request be denied, this Court should grant Plaintiffs' motion to compel for the reasons set forth herein.

**_Background concerning the Effexor XR Action._**  The *Effexor XR* Action is an antitrust action involving individual and class action suits brought by direct and indirect purchasers of brand and generic Effexor XR against Wyeth and Teva Pharmaceutical Industries Ltd. ("Teva") (jointly, "Defendants"), who are the brand manufacturer of Effexor XR and the first generic Effexor XR

---

[1] The Subpoena attached hereto as Ex. A to the Declaration of A. Luke Smith ("Smith Decl.").  All Exhibits referenced herein are attached to the Smith Decl.

manufacturer to launch, respectively.  The lawsuit complains of a "pay for delay" agreement and, as to Wyeth alone, other exclusionary conduct.  Defendants' conduct delayed Teva's launch of less-expensive generic Effexor XR (a $3 billion a year drug) for two years, a restraint of trade that caused purchasers to pay higher prices.  Teva's two-year delay meant that other generic producers (such as Apotex) could not get FDA approval to launch generic Effexor XR for those two years, compounding the restraint of trade.  If Wyeth and Teva had not engaged in "pay for delay" and the other complained-of conduct, other generic producers (like Apotex) would have been able to enter the market six months after Teva's earlier launch.  The purchasers at issue are a class of direct purchasers (such as wholesalers and distributors), a class of indirect purchasers (such as insurers), and various pharmacy chains (such as CVS).

Plaintiffs commenced this action over seven years ago in the District of New Jersey. Following appellate remand, the action is currently in discovery.  The discovery period runs from January 12, 2018 to April 22, 2019, so time is of the essence.

To obtain relevant information on the issues of causation, antitrust injury, and damages, Plaintiffs promptly served numerous subpoenas on non-party generic drug manufacturers like Apotex that filed for regulatory approval and were involved in patent litigation with Wyeth to sell and/or ultimately sold generic Effexor XR after Teva's belated launch.  A total of sixteen such subpoenas were served in or around May 2018, just a few months after the discovery period began. Plaintiffs have been engaged in the meet-and-confer process with Apotex and the other manufacturers.  For the most part, these negotiations have been productive, and many non-party generic drug manufacturers have already made significant productions.  However, negotiations with Apotex have been less productive and very lengthy.

A.      **Categories of Information at Issue**

*__Apotex's sales data.__*  Apotex has refused to produce its transactional sales data showing its sales of generic and AG Effexor XR data, which is essential to seeing who purchased Apotex's generic and AG Effexor XR, in what quantities, at what (net) prices, and at what times.  This data was sought by Requests 13-15 in the Apotex Subpoena, and is relevant to Plaintiffs' damages calculation:  it will be used to calculate how much generic Effexor XR was actually purchased and at what net prices by direct and indirect purchasers, as well as for economic modeling of what quantities would have been purchased and what prices would have been paid by direct and indirect purchasers absent the challenged Wyeth/Teva conduct that delayed all generic Effexor XR competition.   This data is regularly requested and obtained from third parties in similar pharmaceutical antitrust cases, and other generic drug companies in this case have promptly produced transactional data in electronic format in response to similar subpoenas.

*__Forecasts and launch plans, and related documents.__*  Apotex has likewise refused to produce its forecasts and launch plans for its generic version of Effexor XR, authorized generic Effexor XR, and related documents, which were sought by Request 4 of the Apotex Subpoena.  Such documents will show Apotex's anticipated launch date for generic or authorized generic Effexor XR, the quantities it planned to produce, the prices it planned to charge, and Apotex's view of what other drug(s) and firms it would be competing with.  This information is relevant to showing Apotex's view of its ability and plan to launch generic Effexor XR earlier absent the challenged Wyeth/Teva misconduct, its view (as a knowledgeable market participant) of the generic or authorized generic Effexor XR prices that would have been charged based on the number of generic competitors, and its view of who the competitors were (and thus what the relevant antitrust product market was).  These documents, too, are routinely requested and obtained

from third parties in similar pharmaceutical antitrust cases, and in this case other subpoenaed generic drug companies have already produced such documents.

    ***Documents relating to the negotiation and settlement of the patent infringement litigation that Wyeth filed against Apotex, including documents relating to the license Wyeth issued Apotex concerning Effexor XR and AG Effexor XR.*** Wyeth sued many of its would-be generic competitors for Effexor XR, including Apotex. Yet, unlike several other subpoena recipients, Apotex has refused to produce documents relating to its settlement negotiations and ultimate settlement with Wyeth. Such documents are sought by Requests 3 and 12 of the Apotex Subpoena, and are relevant to the question of whether, absent the Wyeth/Teva misconduct, Apotex would have been on the market earlier, either by way of an earlier-reached settlement with Wyeth, a patent litigation victory, or a so-called at-risk launch. This, in turn, is important to economic modeling of the competitive market conditions that would have occurred absent Wyeth/Teva's challenged conduct. Moreover, because Apotex obtained a license to launch an authorized generic version of Effexor XR through its settlement with Wyeth, the negotiations and internal discussions leading up to the settlement will likely shed light on the value and incentives, to Apotex and Wyeth, surrounding launch of an authorized generic, which is similarly important to economic modeling of market conditions absent the Wyeth/Teva settlement and its challenged "no-authorized-generic" ("no-AG") clause.[2] Not only has Apotex refused to produce these documents, but Apotex has also refused to consent to Wyeth producing those negotiation documents that Wyeth and Apotex exchanged that are in Wyeth's possession. (Even if Apotex consented, only Apotex has its portion of those communications, and its internal documents reflecting its internal plans.)

---

[2] The Wyeth-Teva agreement included Wyeth's promise not to launch authorized generic (or "AG") Effexor XR until after Teva was on the market for 6 months. This is called a "no-AG" promise, and it represents a concerted restriction on Teva's output and thus a restraint of trade.

### B.     Transfer to the Issuing Court in the District of New Jersey is Warranted

Pursuant to Rule 45(f), Plaintiffs seek to transfer this discovery dispute to the District of New Jersey, where the *Effexor XR* Action is pending.  Plaintiffs filed the present motion with this Court because Apotex is located in this District, compliance was therefore required in this District, and Rule 45(d)(2)(B)(i) requires that such motions be addressed in the first instance to the court in which compliance is required.  But Rule 45(f) and prevailing caselaw provide that motions to compel compliance with a subpoena may—and here, should—be transferred to the issuing court.

Circumstances justifying transfer to the issuing court exist here.  The *Effexor XR* court in New Jersey is familiar with the facts and issues in this long-running case and is best positioned to rule on this motion to compel.  Transfer is also necessary to avoid the possibility of inconsistent rulings on motion practice concerning the similar *Effexor XR* subpoenas that have been issued to other generic drug companies, compliance with which is required in other districts around the country.  These concerns far outweigh any minimal burden a transfer might impose on Apotex, which often avails itself of the District of New Jersey to bring litigation claims and counterclaims.[3]

## II.    FACTUAL BACKGROUND

### A.     The Challenged Conduct

Plaintiffs allege that Wyeth engaged in an anticompetitive scheme to fraudulently obtain patents purportedly covering Effexor XR, wrongfully list them in FDA's so-called "Orange Book,"[4] and baselessly assert them against potential generic Effexor XR competitors in sham

---

[3] *See, e.g.*, *Apotex Inc. v. Sanofi-Aventis*, 2012 N.J. Super. Unpub. LEXIS 2504 (Super. Ct. App. Div. Nov. 15, 2012) (Apotex filed suit in New Jersey state court); *Apotex, Inc. v. Meda Pharms.*, No. C-012035-14 (N.J. Super. Ct. Ch. Div. June 6, 2014) (same); *Schering Corp. v. Apotex Inc.*, 2012 U.S. Dist. LEXIS 83414, at *1 (D.N.J. June 15, 2012) (Apotex filed a counterclaim); *Daiichi Pharm. Co. v. Apotex, Inc.*, 441 F. Supp. 2d 672, 674 (D.N.J. 2006) (same).
[4] The "Orange Book" is an FDA publication formally entitled "Approved Drug Products with Therapeutic Equivalence Evaluations" that contains, among other things, the patents associated with brand name drugs for which generic manufacturers are seeking FDA approval to market.

litigations to trigger automatic 30-month stays of FDA approval.  *See In re Lipitor Antitrust Litig. & In re Effexor XR Antitrust Litig.*, 868 F.3d 231, 243 (3d Cir. 2017).  Plaintiffs further allege that Wyeth and Teva entered into a "pay-for-delay" agreement under the cover of the baseless Effexor XR patent lawsuit Wyeth filed against Teva.  In that agreement, Wyeth paid Teva to delay Teva's generic Effexor XR launch, right before Teva defeated Wyeth in the baseless patent litigation.  *Id.* at 245.  Plaintiffs allege that the Wyeth-Teva "pay-for-delay" agreement, which included a promise by Wyeth not to launch an "authorized generic" in competition with Teva for 6 months, delayed all subsequent generics, and delayed generic Effexor XR market entry for two years.  *Id.*

Plaintiffs allege that, by fraudulently obtaining these patents, wrongfully listing them in the Orange Book, filing serial sham litigations, and entering into settlement agreements with seventeen generic manufacturers (including Apotex) that had sought approval to market Effexor XR before any decision could be reached on the merits, Wyeth successfully blocked generics from coming to market from June 2008 until July 1, 2010.  *In re Effexor XR Antitrust Litig.*, 2014 U.S. Dist. LEXIS 142206, at *36-41 (D.N.J. Oct. 6, 2014).  Plaintiffs allege that, were it not for this unlawful scheme, Teva would have obtained approval for and launched its generic Effexor XR in June 2008; Wyeth would have simultaneously launched an authorized generic version of Effexor XR (itself or through an agreement with a third party, like it had with Apotex), and subsequent filers (like Apotex) would have obtained approval for and launched their generics starting 180 days thereafter, resulting in substantially lower brand and generic Effexor XR prices much earlier.

Plaintiffs allege injury in the nature of overcharge damages.  These damages are generally measured by the quantities of brand and generic Effexor XR the Plaintiffs and their respective class members bought, multiplied by the difference between (i) the net prices the Plaintiffs and their respective class members paid for brand and generic Effexor XR (including from Apotex)

and (ii) the net prices Plaintiffs would have paid had generic Effexor XR competition not been delayed by Wyeth's and Teva's anticompetitive conduct.

### B.      Plaintiffs Subpoena Apotex

Realizing that Apotex possesses certain information that is not available from Wyeth or another party, Plaintiffs served the Apotex Subpoena on May 17, 2018.  *See* Ex. A, Apotex Subpoena.  It requests, *inter alia*, (i) transaction-level sales data showing Apotex's sales of generic or authorized generic Effexor XR (Requests 13-15); (ii) Apotex's forecasts and launch plans for its generic version of Effexor XR, authorized generic Effexor XR, and related documents (Request 4); (iii) all draft and final settlement and license agreements (including the authorized generic licensing agreement) between Apotex and Wyeth (Request 12); and (iv) communications concerning settlement negotiations relating to generic or authorized generic Effexor XR (Request 3), a request which could be largely (though not entirely) satisfied by Apotex simply consenting to Wyeth producing the settlement negotiation drafts and correspondence, as numerous other non-party generic respondents have done.

On May 24, 2018, Apotex served Objections and Responses to the Apotex Subpoena, which recited boilerplate objections and refused to produce any responsive documents.  *See* Ex. B. In subsequent meet and confers on June 19, June 26, July 11, August 1, September 5, September 10, October 2, October 17, October 24, October 31, and November 11, 2018, Plaintiffs agreed to narrow the scope of their requests for production considerably. Instead of "all documents concerning" the topics, Plaintiffs articulated narrow and specific categories of documents to minimize any burden to Apotex.  Plaintiffs also waived the request for all FDA correspondence concerning Apotex's ANDA, and accepted a small subset of patent-related documents (instead of all documents from the underlying litigation).  Smith Decl. ¶ 5.

Despite this lengthy meet and confer process,[5] Plaintiffs and Apotex reached impasse regarding the three important categories of documents discussed above—sales data, forecasts and launch plans, and settlement negotiation documents.  Apotex should be compelled to produce these documents without further delay (after this motion is transferred to the District of New Jersey).

## III.   THIS COURT SHOULD TRANSFER THIS MATTER TO THE ISSUING COURT IN THE DISTRICT OF NEW JERSEY

Plaintiffs seek to transfer the instant Motion to the District of New Jersey, where the *Effexor XR* Action is pending.  Rule 45 was amended in 2013 to facilitate transfer to the issuing court (here, the District of New Jersey), even absent consent of the subpoena recipient (Apotex), if the court finds "exceptional circumstances."  FED. R. CIV. P. 45(f).  The Advisory Committee notes explain that "transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts."  *Id*.  Exceptional circumstances are routinely found to exist.  *See Hernandez v. Ocwen Loan Servicing, LLC*, 2018 U.S. Dist. LEXIS 84746, at *8-9 (S.D. Fla. May 21, 2018) ("courts routinely transfer motions . . . back to the issuing court").  The requisite "exceptional circumstances" clearly exist here.

### A.   Transfer to the District of New Jersey is Warranted to Ensure Uniformity of Rulings

Exceptional circumstances are present because the same issues would otherwise be presented in multiple districts.  Plaintiffs have served subpoenas on sixteen non-party generic

---

[5] The meet and confer process has been drawn out due to protracted negotiations, the need to coordinate between Apotex and Defendant Wyeth regarding production of trial exhibits from the underlying patent litigation, Apotex's production of its ANDA in hard copy, which needed to be scanned and Bates stamped by Plaintiffs, and Apotex's delays in production.  Plaintiffs ultimately determined that Apotex's productions were wholly inadequate, and resumed meeting and conferring with Apotex, but to no avail:  Apotex has refused to produce the three categories of documents sought by this motion.

manufacturers seeking the same information they have requested from Apotex, which are pending compliance in eight judicial districts.  *See* Ex. E.  To avoid inconsistent rulings from multiple courts and ensure uniformity with respect to non-parties' obligations to respond to subpoenas, the Court should transfer this motion to the District of New Jersey.  *See, e.g., Dispatch Printing Co. v. Zuckerman*, 2016 U.S. Dist. LEXIS 10184, at *9 (S.D. Fla. Jan. 27, 2016) (granting transfer where "demonstrable risk of inconsistent discovery rulings" shown); *Miller Constr. Equip. Sales, Inc. v. Clark Equip. Co.*, 2016 WL 447717, at *4 (S.D. Ga. Feb. 3, 2016) (granting transfer to "avoid[] the potential for inconsistent rulings") (citations omitted).

### B.    Transfer to the District of New Jersey is Warranted Because the Court in the *Effexor XR* Action Is in the Best Position to Rule on the Motion to Compel

Exceptional circumstances are present because the District of New Jersey knows the issues in this case and is in the best position to rule.  *See Dispatch Printing*, 2016 U.S. Dist. LEXIS 10184, at *6 (exceptional circumstances are present "if the judge from the issuing court is in a better position to rule on the motion due to her familiarity with the full scope of the issues involved as well as any implications the resolution of the motion will have on the underlying litigation.") (quotation omitted).  "These factors include the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation."  *Id.* (quoting *Judicial Watch, Inc. v. Valle Del Sol, Inc.*, 2014 WL 4954368, at *3 (D.D.C. Oct. 3, 2014)).

The *Effexor XR* Action is a long-pending coordinated group of class and non-class actions concerning a multi-element scheme to unlawfully delay generic competition.  It has been pending for seven years, has been the subject of an appeal, and has generated at least ten reported and

unreported opinions.[6]  The Apotex Subpoena (like the fifteen other similar pending non-party subpoenas) requests specific categories of information reflective of this complexity.  Given the complex nature of this litigation, and the experience of the District of New Jersey in presiding over it, the District of New Jersey, as the issuing court, is in the best position to understand the relevance of the requested materials, and whether their production should be compelled.  *See, e.g.*, *Dispatch Printing*, 2016 U.S. Dist. LEXIS 10184, at *7 (transferring motion to issuing court due to case's "complex history"); *U.S. v. Roy*, 2018 U.S. Dist. LEXIS 48401, at *9 (S.D. Fla. Mar. 21, 2018) (granting transfer due to "duration" and "complexity" of case); *In re NeJame Law*, 2016 U.S. Dist. LEXIS 53538, at *18-19 (M.D. Fla. Apr. 21, 2016) (granting transfer due to "complexities" that made "resolution . . . by a single court preferable to litigation in multiple courts"); *Judicial Watch*, 307 F.R.D at 35 (transferring where case was pending for four years and entailed "innumerable discovery disputes"); *In re UBS Fin. Servs., Inc. of Puerto Rico Sec. Litig.*, 113 F. Supp. 3d 286, 288 (D.D.C. 2015) (transferring where case "involve[d] complex securities issues" and had been pending for over three years).

Being intimately involved with the key procedural, factual, and legal issues in the underlying matter for nearly a decade, the issuing court is in the best position to rule upon the present motion.  Transfer is therefore proper.  *See, e.g.*, *Dispatch Printing*, 2016 U.S. Dist. LEXIS 10184, at *7 ("[F]amiliarity with the underlying action . . . is a compelling factor in highly complex

---

[6] *In re Effexor XR Antitrust Litig.*, No. 11-5479, ECF 17 (D.N.J. June 21, 2011) (granting motion to consolidate); *id.*, ECF 44 (Sept. 21, 2011) (granting venue change); *id.*, ECF 126 (Feb. 24, 2012) (denying discovery commencement); *Prof'l Drug Co. v. Wyeth Inc.*, 2012 U.S. Dist. LEXIS 147607 (D.N.J. Oct. 2, 2012) (denying *amicus* motion); *In re Effexor XR Antitrust Litig.*, 2012 U.S. Dist. LEXIS 199529 (D.N.J. Oct. 23, 2012) (granting stay); *In re Effexor XR Antitrust Litig.*, 2014 U.S. Dist. LEXIS 142206 (D.N.J. Oct. 6, 2014) (granting in part motions to dismiss); *In re Effexor XR Antitrust Litig.*, 2015 U.S. Dist. LEXIS 188728 (D.N.J. Nov. 23, 2015) (denying motion to intervene); *In re Lipitor Antitrust Litig.*, 855 F.3d 126 (3d Cir. 2017) (jurisdiction ruling); *In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017) (reversing motions to dismiss); *In re Effexor Antitrust Litig.,* 337 F. Supp. 3d 435 (D.N.J. 2018) (adjudicating Rule 12(c) motions).

cases where the issuing court is aware of the full scope of issues involved as well as any implications the resolution of the motion will have on the underlying litigation.") (quoting *In re Niaspan Antitrust Litig.*, 2015 WL 3407543, at *1 (D. Md. May 26, 2015)).

### C.   Transfer to the District of New Jersey Would Impose Little if Any Burden on Apotex, and Any Burden Can Be Easily Alleviated

Any burden on Apotex from transfer of this motion would be minimal and does not outweigh the interests of ensuring uniformity of rulings and deference to the *Effexor XR* court. This motion asks Apotex to produce a limited number of documents electronically, which imposes no burden on Apotex.  *See Dispatch Printing*, 2016 U.S. Dist. LEXIS 10184, at *11 (no significant burden where subpoenaed party "only require[d] . . . to produce a small number of documents electronically"); *Judicial Watch*, 307 F.R.D. at 34 (minimal burden on subpoenaed party where electronic production allowed).  And it is unlikely that Apotex would be required to travel to New Jersey for a hearing; if this motion is transferred, Plaintiffs will petition the *Effexor XR* court to allow Apotex and its counsel to attend any hearings on this motion telephonically, consistent with the instructions of Rule 45.  *See* FED. R. CIV. P. 45(f); *see also Dispatch Printing*, 2016 U.S. Dist. LEXIS 10184, at *11 (no significant burden where travel to issuing court unlikely).  This will alleviate any burden to Apotex of having to litigate in the District of New Jersey.[7]  In addition, Apotex is part of a large, sophisticated Canadian conglomerate with national and international reach.  "About Apotex" Official Website, *available at* http://www1.apotex.com/global/about-us/about-apotex ("We export to more than 115 countries and territories, and operate in more than

---

[7] As this Court recently explained, "because compliance courts routinely transfer motions . . . back to the issuing court," it would not even require a motion to compel that was improperly filed in the issuing court to be re-filed in the compliance court, because there was "no significant burden on [subpoena respondent] to litigate here . . . as it was permitted to appear by phone . . . without the presence of local counsel."  *Hernandez v. Ocwen Loan Servicing, LLC*, 2018 U.S. Dist. LEXIS 84746, at *8-9 (S.D. Fla. May 21, 2018).

45 countries, including a significant presence in the US, Mexico and India . . .").  Apotex products are marketed and sold nationwide, including in New Jersey.  *The Medicines Co. v. Apotex Corp.*, No. 13-cv-2801, ECF 8, Answer to Compl. ¶ 11 (D.N.J. July 19, 2013) ("Apotex admits that it has distributed and/or sold generic pharmaceutical products in the State of New Jersey.").  Apotex regularly avails itself of jurisdiction in New Jersey (*see supra* at 5 n.3 (citing cases)), and its counsel in this matter is based in Chicago, not in this District.  Moreover, Apotex has no interest in "local" resolution of the motion and would not be financially or otherwise burdened by adjudicating it in New Jersey.  *See, e.g.*, *Google, Inc. v. Digital Citizens All.*, 2015 WL 4930979, at *4 (D.D.C. Jul. 31, 2015) ("[W]here a nonparty's national reach or strong connection to the forum reduces their interest in local resolution, the balance more easily weighs in favor of transfer."); *XY, LLC v. Trans Ova Genetics L.C.*, 307 F.R.D. 10, 12 (D.D.C. 2014) ("presumption in favor of local resolution carried less force" for nonparty national organization).

## IV.  ALTERNATIVELY, APOTEX SHOULD BE COMPELLED TO PRODUCE THE DOCUMENTS REQUESTED IN THE APOTEX SUBPOENA

There are strong bases to transfer this matter to the issuing court, so this Court need not consider the motion to compel on its merits.  Should the Court nonetheless decide to do so, the motion to compel should be granted.

### A.  Legal Standard

Rule 26(b)(1) provides that discovery encompasses that which "is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P.26(b)(1).  Relevancy is broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or the merits of the case.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("The key phrase in this definition—'relevant to the subject matter involved in the pending action'—has been construed broadly to encompass any matter that bears on, or that reasonably

could lead to other matters that could bear on, any issue that is or may be in the case.").

"[T]he onus is on the party resisting discovery . . . to demonstrate specifically how the objected-to request is unreasonable or otherwise burdensome." *J&C Nationwide, Inc. v. Key W. Oncology Assocs.*, 2006 U.S. Dist. LEXIS 50275, at *6-7 (N.D. Ga. July 24, 2006) (citation omitted). To overcome a motion to compel on the basis of lack of relevance, a respondent must show the requested material "has no possible bearing on the claims and defenses in this case." *Milinazzo v. State Farm Ins. Co*., 247 F.R.D. 691, 695 (S.D. Fla. 2007). "Objections which state that a discovery request is vague, overly broad, or unduly burdensome are, by themselves, meaningless, and are deemed without merit." *Badger Auctioneers, Inc. v. Ali*, 2017 U.S. Dist. LEXIS 149704, at *4-5 (M.D. Fla. Sept. 15, 2017). "Where relevance is in doubt . . . the court should be permissive," particularly where the district court's "only connection with a case is supervision of discovery ancillary to an action in another district[.]" *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211-12 (Fed. Cir. 1987) (quotations and citations omitted).

## B.    Apotex's Sales Data Is Relevant, Not Obtainable from Defendants, and Not Burdensome to Produce

Request 13 seeks Apotex's generic and AG Effexor transactional-level sales data:

Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format from June 1, 2008 to the present sufficient to identify sales of Generic Effexor XR to direct purchasers in a transaction-by-transaction format, as follows:

a. All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) product description, (xii) product form, (xiii) product strength, (xiv) package size in extended units per package, (xv) customer name (including indirect customer name), (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix)

the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like).

b. All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom Defendants paid, or on whose behalf Defendants accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which Defendants paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular product sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated.

c. All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; d. Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity."

Ex. A (Apotex Subpoena), at 17-19.  Request 14 seeks documentation for Apotex's sales data:

complete documentation for all items in Request 13(a) through (d) supra including but not limited to (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate product list, including NDC, SKU, UPC, product description, and package size; (bb) a separate table that lists, for each 'bill-to customer' and 'ship-to customer,' the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be

treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms.

*Id.* at 19.  Request 15 seeks "[a]ll documents concerning any other price adjustment given to any direct purchaser not related to specific sales of Generic Effexor XR, i.e., not available in transaction-by-transaction format."  *Id.* at 19.  Apotex objected to Requests 13-15 as "overbroad and unduly burdensome," seeking "information that is irrelevant and not proportional to the needs of the case," on privilege grounds,[8] and stated that "materials requested for the period 2008 through 2013 do not exist."  Ex. B (Objections and Responses to the Apotex Subpoena), at 12-14.

Apotex's objections are baseless.  Apotex's transactional sales data showing its sales of generic and AG Effexor XR and related documentation is plainly relevant to Plaintiffs' allegation that Wyeth's and Teva's anticompetitive conduct harmed Plaintiffs and the members of the respective classes by causing them to pay higher prices than they otherwise would have.  Plaintiffs must demonstrate antitrust impact (injury, in the form of higher prices, caused by the anticompetitive conduct) and class-wide damages (the difference between the brand and generic prices actually paid by Plaintiffs and the classes and the prices that would have been paid if generic Effexor XR and AG Effexor XR had been available earlier).  Apotex's transactional sales data— which provides the actual prices purchasers paid for Apotex's generic and AG Effexor XR—are a

---

[8] Apotex objected to each Request "to the extent it seeks disclosure of Privileged Information." This objection provides no basis to deny this motion or for Apotex to withhold responsive non-privileged documents, including Apotex's sales data, launch plans and forecasts, and settlement documents Apotex and Wyeth exchanged.  Apotex must produce all non-privileged documents responsive to the Requests at issue in this motion and identify any such purportedly privileged documents on a privilege log so that the Plaintiffs can evaluate Apotex's privilege assertions.  *See, e.g.*, *Thompson v. Empire Indem. Ins. Co.*, 2008 WL 11444200, at *1 (M.D. Fla. Oct. 9, 2008) (where "Plaintiff's subpoenas … sweep too broadly and have the potential of requiring non-parties to produce privileged documents," "the best solution … is to deny the motion to quash … and direct the non-parties to comply with the subpoena but only to the extent that they must only produce non-privileged documents," and "provide Plaintiff with a privilege log").

necessary input for what was actually paid and supplies benchmarks for what would have been paid, and will be used by Plaintiffs and their experts to demonstrate antitrust impact and damages on a class-wide basis. *See In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *14-15 (E.D. Pa. Aug. 11, 2011) (discussing "before and after" methodology, which "produces an aggregate damages estimate that is based on deriving a benchmark for generic prices in the 'but for world' based on the actual experience for branded and generic prices after entry"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 311-12 (D.D.C. 2007) (noting actual generic prices are used for damages calculation in delayed generic entry antitrust cases). "'[T]he production of voluminous transactional data . . . in an antitrust case is routine and happens in every case.'" F. Matthew Ralph & Caroline B. Sweeney, *E-Discovery and Antitrust Litigation*, 26 ANTITRUST 58, 61 (2011) (citation omitted). Antitrust cases require substantial data analysis. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 632 (1985) ("antitrust issues, prone to complication, require sophisticated legal and economic analysis"). Denying relevant data discovery can constitute reversible error. *E.g.*, *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1192 (11th Cir. 2003) (district court erred by prohibiting certain data discovery).

Transactional sales data sought by Requests 13-15 of the Apotex Subpoena is routinely requested and produced by non-parties—in this case and others—under similar circumstances, usually voluntarily but by court order if needed. In fact, Apotex itself was recently compelled by this Court to produce virtually identical sales data in the *Celebrex* litigation. *See Direct Purchaser Class v. Apotex Corp.*, 2017 U.S. Dist. LEXIS 159585 (S.D. Fla. May 15, 2017) ("*Celebrex*"). *Celebrex*, like this matter, involved enforcement of a non-party subpoena against Apotex in an antitrust case involving delayed generic entry. The plaintiffs there issued a subpoena to Apotex seeking "sales data for generic Celebrex and/or authorized generic Celebrex in electronic format,

at the transaction level, showing each transaction from December 1, 2014 to the present" including a dozen requested fields of data. *Id.* at *3-4. The court found that the transaction-level sales data sought by the plaintiffs (the same data Plaintiffs request in the Apotex Subpoena) was relevant and that the plaintiffs had demonstrated a need for the sales data—namely, to allow the plaintiffs' economic experts to construct a model to determine the price for generic Celebrex absent the defendant's anticompetitive conduct. *Id.* at *7-8. The court thus ordered Apotex to comply with the subpoena. *Id.* at *12. *See also In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 173403, at *7-10 (S.D.N.Y. Oct. 19, 2017) (ordering non-party generic to produce transactional sales data in an antitrust case because monthly sales summaries were inadequate).

The same result should obtain here. Apotex has articulated no burden associated with producing the requested data, and in fact previously agreed to produce it. Smith Decl. at 3 n.1. Nor can Apotex show any burden likely to outweigh the benefit of the requested discovery to the issues in this case, given that the data is highly relevant to damages. *See, e.g.*, *J&C Nationwide*, U.S. Dist. LEXIS 50275, at *7 (compelling production where respondent failed to show undue burden); *In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 654 (M.D. Fla. 2007) (same).

### C.    The Apotex Forecasts and Launch Projections Are Relevant, Not Obtainable From Defendants, and Not Burdensome to Produce

Request 4 of the Apotex Subpoena seeks "draft and final forecasts/projections containing the anticipated regulatory approval dates, launch dates, sales (in dollars and units), including assumptions used, for Generic Effexor XR, and/or any Authorized Generic Effexor ER." Ex. A (Apotex Subpoena), at 13. Apotex objects to this request as "overbroad and unduly burdensome" and on privilege grounds. Ex. B (Objections and Responses to the Apotex Subpoena), at 7.

This objection is without merit. Apotex's forecasts and launch plans for its generic version of Effexor XR, authorized generic Effexor XR, and related documents are also relevant to

Plaintiffs' claims, as they reflect a knowledgeable market participant's contemporaneous expectations of the timing and impact of generic entry on brand market share and market prices. Because some of these forecasts and launch plans were created before the pay-for delay agreements or Apotex's settlement with Wyeth, they are probative of when Apotex believed generic competition would have begun absent the challenged delay in generic competition, and what the effect of that earlier competition would have been on units and prices. Plaintiffs' experts are permitted to and often do use the forecasts of knowledgeable market participants like Apotex to determine what the price of generic Effexor XR would have been as a function of the number of generic firms expected to enter the market, and what generic market share would have been based on the timing of forecasted generic entry. *See, e.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777, at *7-9 (Oct. 16, 2017) (certifying a class of direct purchasers where the plaintiffs' expert (a) relied on nonparty and party generic company forecasts as common evidence of classwide impact, and (b) used these generic company forecasts to calculate what the generic market share would have been and damages); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *9-10 (N.D. Cal. Feb. 21, 2017) (certifying the direct purchaser class in a similar case challenging a "no-authorized generic" promise where the plaintiffs' expert relied on generic company forecasts as one form of evidence of classwide impact); *Wellbutrin XL*, 2011 WL 3563385, at *12 (class certification granted where plaintiffs' evidence of classwide injury included nonparty generic company forecasts); *In re Neurontin Antitrust Litig.*, 2011 WL 286118, at *7-8 (D.N.J. Jan. 25, 2011) (same); *Teva Pharms. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 229 (D. Del. 2008) (same). Generic manufacturer forecasts also typically reflect the expectation that all generic sales would be stolen from the corresponding brand (here, branded Effexor XR), not other, non-bioequivalent products, which is probative of the composition of the relevant antitrust market.

18

Defendants do not possess Apotex's forecasts or launch plans, so these relevant documents must be obtained from Apotex. And, once again, Apotex has not articulated any burden associated with production of these documents, nor can it. *See J&C Nationwide*, U.S. Dist. LEXIS 50275, at *7; *In re Seroquel Prods.*, 244 F.R.D. at 654. Apotex should thus be compelled to produce these documents since their relevance far outweighs any burden to Apotex.

**D.     The Apotex Settlement and Authorized Generic Negotiation Documents Are Relevant and Not Burdensome to Produce**

Request 3 seeks "[a]ll documents from the files of Bernard Sherman or other Apotex, Inc. employees or representatives that participated in the negotiation of Wyeth's settlement of the Effexor Patent Litigation with Apotex, Inc. relating to Generic Effexor XR." Ex. A (Apotex Subpoena), at 13. Request 12 seeks "[a]ll draft and final Agreements pertaining, directly or indirectly, in whole or in part, to Generic Effexor XR or any Authorized Generic Effexor XR, including any and all schedules, exhibits, attachments, or amendments thereto." *Id.* at 17. Apotex objects to these Requests as "overbroad and unduly burdensome," seeking information that is "unreasonably duplicative and cumulative" and "irrelevant and not proportional to the needs of the case," and on privilege grounds. Ex. B (Objections and Responses to the Subpoena), at 7, 12.

Again, Apotex's objections are entirely baseless. Documents relating to the negotiation and settlement of the patent infringement litigation that Wyeth filed against Apotex concerning Apotex's generic version of Effexor XR, including documents relating to the license Wyeth issued Apotex concerning Effexor XR and AG Effexor XR, are likewise relevant. First, regarding the AG license-related documents, these documents will permit Plaintiffs to value the AG to Wyeth and Apotex, and thus assist in valuing Wyeth's "no-AG" promise to Teva. The money Wyeth made from launching a delayed AG is relevant to the value Wyeth sacrificed in delaying its AG by agreement with Teva. That same value bears upon Wyeth's financial incentives and willingness

to launch an AG, either itself or through a third party such as Apotex, and thus is probative of the question whether Wyeth would have launched an AG simultaneously with Teva's entry absent the challenged "no-AG" agreement complained of in this case.  These documents will also be relevant to the timing and steps involved in preparing the launch of the delayed AG and thus what the timing would have been absent the complained-of delay in generic and AG competition.

Apotex has not articulated any burden associated with production of these documents, nor can it.  *See J&C Nationwide*, U.S. Dist. LEXIS 50275, at *7; *In re Seroquel Prods.*, 244 F.R.D. at 654.  There is certainly no burden to Apotex consenting to Wyeth producing documents that Wyeth and Apotex exchanged during their negotiations.  Nor is there any burden to Apotex producing the limited requested documents, which are likely contained in the records of few custodians within a relatively narrow date range, and are not likely to be voluminous.  Apotex should be compelled to produce these documents since their relevance far outweighs any burden to Apotex.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Compel should be transferred to the District of New Jersey where the *Effexor XR* Action is pending given that court's familiarity with the underlying *Effexor XR* Action.  Alternatively, in the absence of transfer, this Court should grant the Motion to Compel and compel Apotex to promptly produce the three categories of documents and information responsive to the Apotex Subpoena sought by this motion:  (1) Apotex's sales data showing its sales of generic and AG Effexor XR as set forth in Requests 13-15; (2) its forecasts and launch plans for its generic version of Effexor XR, authorized generic Effexor XR, and related document as set forth in Request 4; and (3) documents relating to the negotiation and settlement of the patent infringement litigation that Wyeth filed against Apotex concerning Apotex's generic version of Effexor XR, including documents relating to the license Wyeth issued Apotex concerning Effexor XR and AG Effexor XR as set forth in Requests 3 and 12.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)</u>

The undersigned hereby certifies that, pursuant to Local Rule 7.1(a)(3), counsel for Plaintiffs conferred with Apotex in a good faith effort to resolve the issues raised in this motion and was unable to do so.  Plaintiffs also sought Apotex's consent to transfer this motion to the District of New Jersey and Apotex refused.  *See* Ex. F.  Despite Plaintiffs' best efforts, court intervention is now needed.

Dated:  February 15, 2019

Respectfully submitted,

/s/ *Anna T. Neill*
Anna T. Neill
Scott E. Perwin
Lauren C. Ravkind
KENNY NACHWALTER P.A.
Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
Email: aneill@knpa.com
Email: sperwin@knpa.com
Email: lravkind@knpa.com

*Attorneys for Walgreen Plaintiffs*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2019 a true and correct copy of the foregoing was served by electronic mail on all counsel in the *In re: Effexor XR Antitrust Litigation*, 11-cv-05479 (D.N.J.), and by electronic mail and by U.S. Mail on counsel for Apotex Corp.

/s/ *Anna T. Neill*
Anna T. Neill